# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN IRON AND STEEL INSTITUTE, )
STEEL MANUFACTURERS ASSOCIATION, )
SPECIALTY STEEL INDUSTRY OF NORTH )
AMERICA, )
                        )
      Petitioners, )
                        )    Case No. 24-1083
      v. )
                        )
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY, and MICHAEL S. )
REGAN, Administrator, United States )
Environmental Protection Agency, )
                        )
      Respondents. )

## PETITION FOR REVIEW

The American Iron and Steel Institute, Steel Manufacturers Association, and Specialty Steel Industry of North America ("Petitioners") hereby petition this Court, pursuant to Rule 15 of the Federal Rules of Appellate Procedure, D.C. Circuit Rule 15, the Administrative Procedure Act, and Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), for review of the final action of the Respondents United States Environmental Protection Agency ("EPA") and Administrator Michael S. Regan promulgating the interim final rule titled "New Source Performance Standards Review for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarburization Vessels; Corrections" ("Interim Final Rule"), and

published in the Federal Register at 89 Fed. Reg. 11,198 (February 14, 2024). A copy of EPA's Interim Final Rule is attached to this Petition and identified as Attachment A.

This Interim Final Rule is directly related to EPA's "New Source Performance Standards Review for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarburization Vessels" that the same Petitioners here are contesting in *American Iron and Steel Institute, et al. v. EPA, et al.*, Case No. 23-1292. Accordingly, the Petitioners believe this petition should be consolidated with *American Iron and Steel Institute, et al. v. EPA, et al.*, Case No. 23-1292.

Dated: April 15, 2024          Respectfully submitted,

/s/ Wayne J. D'Angelo
Wayne J. D'Angelo

Wayne J. D'Angelo
Joseph J. Green
Zachary J. Lee
KELLEY DRYE & WARREN LLP
3050 K Street, NW
Suite 400
Washington, DC 20007
(202) 342-8525
WDAngelo@KelleyDrye.com
JGreen@KelleyDrye.com
ZLee@KelleyDrye.com

*Counsel for Petitioners American Iron and Steel*

*Institute, Steel Manufacturers Association, and Specialty Steel Industry of North America*

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| AMERICAN IRON AND STEEL INSTITUTE, STEEL MANUFACTURERS ASSOCIATION, SPECIALTY STEEL INDUSTRY OF NORTH AMERICA, | ) ) ) ) ) | |
| Petitioners, | ) ) | Case No. 24-1083 |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) | |
| Respondents. | ) | |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure and Circuit Rule 26.1 and Circuit Rule 26.1, the petitioners, AMERICAN IRON AND STEEL INSTITUTE ("AISI"), STEEL MANUFACTURERS ASSOCIATION ("SMA"), and SPECIALTY STEEL INDUSTRY OF NORTH AMERICA ("SSINA"), file the following statements:

AISI serves as the voice of the North American steel industry and represents producer member companies, including integrated and electric arc furnace steelmakers, and associate members who are suppliers to, or customers of, the steel industry. AISI states that it is a "trade association" for purposes of Circuit

Rule 26.1(b). AISI has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in AISI.

SMA is the primary trade association for electric arc furnace steelmakers, operated for the purpose of promoting the general interests of its membership. SMA states that it is a "trade association" for purposes of Circuit Rule 26.1(b). SMA has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in SMA.

SSINA is the primary trade association for producers of specialty metals, manufacturing products like semi-finished, bar, rod, wire, angles, plate, sheet and strip, in stainless steel and other high performance materials. SSINA states that it is a "trade association" for purposes of Circuit Rule 26.1(b). SSINA has no outstanding shares or debt securities in the hand of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in SSINA.

Dated: April 15, 2024          Respectfully submitted,


                               /s/ Wayne J. D'Angelo
                               Wayne J. D'Angelo

                               Wayne J. D'Angelo

Joseph J. Green
Zachary J. Lee
KELLEY DRYE & WARREN LLP
3050 K Street, NW
Suite 400
Washington, DC 20007
(202) 342-8525
WDAngelo@KelleyDrye.com
JGreen@KelleyDrye.com
ZLee@KelleyDrye.com

*Counsel for Petitioners American Iron and Steel
Institute, Steel Manufacturers Association, and
Specialty Steel Industry of North America*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 15(c), Circuit Rule 15(a), Fed. R. App. P. 25, and 40 CFR 23.12(a), on this date, I hereby certify that I will cause to be served a true copy of the foregoing Petition for Review via U.S. Mail on the 15th day of April, 2024, return-receipt requested, to the following:

Hon. Michael S. Regan
Office of the Administrator (1101A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Hon. Merrick B. Garland
Attorney General for the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Office of General Counsel (2311)
Correspondence Control Unit
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460


Dated:  April 15, 2024                    /s/ Wayne J. D'Angelo
                                          Wayne J. D'Angelo

**Attachment A**

**"New Source Performance Standards Review for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarburization Vessels; Corrections"**

**89 Fed. Reg. 11,198 (February 14, 2024)**

\* \* \* \* \*

### TABLE 37 TO SUBPART D OF PART 161—DOCUMENTATION REQUIRED TO MODIFY A GENDER MARKER IN DEERS TO CORRECT AN ADMINISTRATIVE ERROR

| Status | Documentation |
| --- | --- |
| Sponsor or Dependent ..................... | Birth certificate and FIPS Pub 201–3 "Personal Identity Verification (PIV) of Federal Employees and Contractors," Identity Proofing and Registration Requirements primary and secondary identity source documentation (Note). |

**Note:** Documentation from the FIPS Pub 201–3, PIV Identity Proofing and Registration Requirements primary and secondary identity source document lists that establishes gender.

\* \* \* \* \*

Dated: February 5, 2024.

**Patricia Toppings,**
*OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2024–02621 Filed 2–13–24; 8:45 am]

**BILLING CODE 6001–FR–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 60

[EPA–HQ–OAR–2002–0049; FRL–8150.1–03–OAR]

### New Source Performance Standards Review for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarburization Vessels; Corrections

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking interim final action on corrections and clarifications to the new source performance standards (NSPS) for electric arc furnaces and argon-oxygen decarburization vessels in the steel industry. The corrections and clarifications are being made to address unintended and inadvertent errors in the recently finalized standards.

**DATES:** This interim final rule is effective on February 14, 2024. Comments on this rule must be received on or before March 15, 2024.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2002–0049 by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov* (our preferred method). Follow the online instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Include Docket ID No. EPA–HQ–OAR–2002–0049 in the subject line of the message.

• *Fax:* (202) 566–9744. Attention Docket ID No. EPA–HQ–OAR–2002–0049.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID No. EPA–HQ–OAR–2002–0049, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For detailed instructions on sending comments, see the "*Public Participation*" heading of the General Information section of this document under **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:** Donna Lee Jones, Sector Policies and Programs Division (D243–02), 109 T.W. Alexander Drive, P.O. Box 12055, Office of Air Quality Planning and Standards, United States Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone number: (919) 541–5251; email address: *jones.donnalee@epa.gov.*

*Preamble acronyms and abbreviations.* Throughout this document the use of "we," "us," or "our" is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

AOD   argon-oxygen decarburization
APA   Administrative Procedure Act
BLDS   bag leak detection system
CAA   Clean Air Act
CBI   confidential business information
CFR   Code of Federal Regulations
CRA   Congressional Review Act
DCOT   during the digital camera opacity technique
DEC   direct shell evacuation control
EAF   electric arc furnace

EPA   Environmental Protection Agency
FR   Federal Register
FTP   File Transfer Protocol
NAICS   North American Industry Classification System
NSPS   new source performance standards
NTTAA   National Technology Transfer and Advancement Act
OMB   Office of Management and Budget
PM   particulate matter
PRA   Paperwork Reduction Act
RFA   Regulatory Flexibility Act
UMRA   Unfunded Mandates Reform Act of 1995
U.S.   United States of America
U.S.C.   United States Code

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
  A. Public Participation
  B. Potentially Affected Entities
  C. Statutory Authority
  D. Judicial Review and Administrative Review
II. Regulatory Revisions
  A. Background and Summary
  B. Specific Regulatory Revisions
III. Rulemaking Procedures
IV. Request for Comment
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review, as Amended by Executive Order 14094: Modernizing Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act of 1995 (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing our Nation's Commitment to Environmental Justice for All
  K. Congressional Review Act (CRA)

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Public Participation*

Submit your written comments, identified by Docket ID No. EPA–HQ–OAR–2002–0049, at *https://www.regulations.gov* (our preferred method), or by the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. This type of information should be submitted as discussed in the *Submitting CBI* section of this document. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI or multimedia submissions; and general guidance on making effective comments.

*Submitting CBI.* Do not submit information containing CBI to the EPA through *https://www.regulations.gov.* Clearly mark the part or all of the information that you claim to be CBI. For CBI information on any digital storage media that you mail to the EPA, note the docket ID, mark the outside of the digital storage media as CBI, and identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comments that includes information claimed as CBI, you must submit a copy of the comments that does not contain the information claimed as CBI directly to the public docket through the procedures outlined in the *Public Participation* section of this document. If you submit any digital storage media that does not contain CBI, mark the outside of the digital storage media clearly that it does not contain CBI and note the docket ID. Information not marked as CBI will be included in the public docket and the EPA's electronic public docket without prior notice.

Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2.

Our preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol (FTP), or other online file sharing services (*e.g.,* Dropbox, OneDrive, Google Drive). Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqpscbi@epa.gov,* and as described above, should include clear CBI markings and note the docket ID. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqpscbi@epa.gov* to request a file transfer link. If sending CBI information through the postal service, please send it to the following address: OAQPS Document Control Officer (C404–02), OAQPS, U.S. Environmental Protection Agency, 109 T.W. Alexander Drive, P.O. Box 12055 RTP, North Carolina 27711, Attention Docket ID No. EPA–HQ–OAR–2002–0049. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

*B. Potentially Affected Entities*

The source category that is the subject of this interim final action is composed of steel manufacturing facilities that operate electric arc furnaces (EAF) and argon-oxygen decarburization (AOD) vessels regulated under CAA section 111 New Source Performance Standards (NSPS). The 2022 North American Industry Classification System (NAICS) code for the source category is 331110 for "Iron and Steel Mills and Ferroalloy Manufacturing" processes. The NAICS code serves as a guide for readers outlining the type of entities that this interim final action is likely to affect.

There are approximately 88 EAF facilities in the United States of America (U.S.), with most (>95 percent) EAF facilities subject to one of the EAF NSPS that are described below.

The information provided in this section on potentially affected entities is not intended to be exhaustive. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*C. Statutory Authority*

Statutory authority to issue the amendments finalized in this action is provided by the same Clean Air Act (CAA) provisions that provided

authority to issue the regulations being amended: CAA section 111(b)(1)(B) (requirement to review, and if appropriate, revise, NSPS standards at least every 8 years), and CAA section 301, 42 U.S.C. 7601 (general rulemaking authority). Statutory authority for the rulemaking procedures followed in this action is provided by Administrative Procedure Act (APA) section 553, 5 U.S.C. 553.

*D. Judicial Review and Administrative Review*

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit by April 15, 2024. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

**II. Regulatory Revisions**

*A. Background and Summary*

In 1975, the EPA first promulgated the EAF NSPS (subpart AA) to regulate emissions of particulate matter (PM) from new, reconstructed or modified EAF that produce steel. These standards apply to sources that commenced construction, modification, or reconstruction after October 21, 1974, and on or before August 17, 1983. In 1984, the EPA promulgated an updated EAF NSPS as subpart AAa, which revised the standards for EAF and also addressed AOD units. These standards apply to sources that commenced construction, modification or reconstruction after August 17, 1983, and on or before May 16, 2022. On August 25, 2023, the EPA promulgated amendments to the EAF NSPS (88 FR 58459), including a new NSPS subpart AAb that establishes standards applicable to units that are new, modified, or reconstructed after May 16, 2022, as well as certain amendments to NSPS subparts AA and AAa that are applicable to units that began construction or reconstruction by the earlier dates specified in those two subparts.

Relevant to this action, the 2023 final rule included the following: (1) a new NSPS subpart AAb which maintained the requirement for facilities to meet a shop opacity of six percent during charging [1]—the same as is required

---

[1] There are three stages of EAF operation, where one of the three stages is charging of raw materials (metal scrap) into the EAF. Charging typically occurs in periods of less than 1 minute to up to 3
Continued

under subparts AA and AAa; and required opacity testing to be performed once a day during charging for 3 minutes using EPA Method 9 in appendix A to part 60 of this chapter, from the average of 12 consecutive observations recorded at 15-second intervals; (2) a provision under subparts AA, AAa, and AAb that permits EAF, AOD, or both facilities with direct shell evacuation control (DEC) that want to avoid the requirement to use a furnace static pressure monitoring device to, as an alternative, perform observations of shop opacity no less than once per week from the end of one EAF heat cycle to the end of the following heat cycle (a heat cycle means the period beginning when scrap is charged to an EAF shell and ending when the EAF tap is completed or beginning when molten steel is charged to an AOD vessel and ending when the AOD vessel tap is completed); and (3) a compliance date for provisions applicable to facilities subject to subpart AA or AAa of February 21, 2024. The standards and requirements under subpart AAb were effective immediately upon publication of the final rule on August 25, 2023.

Following issuance of the final rule, the EPA was notified by industry representatives of several errors in the final regulatory text for subparts AA, AAa, and AAb. The American Iron and Steel Institute (''AISI''), the Steel Manufacturers Association (''SMA''), and the Specialty Steel Industry of North America (''SSINA'') (collectively, ''the Steel Associations'') submitted letters on August 17 and September 29, 2023, detailing concerns with the final rule, including certain new requirements in the final regulatory text, and requested corrections. In addition, on October 24, 2023, the Steel Associations submitted a petition for reconsideration and a request for an administrative stay pursuant to CAA section 307(d)(7)(B), identifying, among other issues, concerns with new requirements in the final regulatory text.[2]

This action addresses errors identified by the Steel Associations, which are described in the following paragraphs, as well as errors identified by the EPA. This action does not attempt to address all issues identified in the Steel

minutes. Steel is produced in batches, where a single batch can last from 1 hour to 10 hours, where 5 hours is a typical batch time period. Charging, therefore, is a small subset of the time that an EAF is operating.

[2] On the same day, the Steel Associations filed a petition for review of the 2023 final rule in the D.C. Circuit. *Am. Iron & Steel Institute* v. *EPA,* No. 23–1292. The litigation is presently in abeyance while the EPA undertakes this action.

Associations communications, as the EPA continues to review the other issues not directly addressed in this action. To the extent the EPA determines that additional action is appropriate to address these other issues, we will initiate a separate rulemaking action.

In the 2023 final rule, the EPA inadvertently included a requirement under subparts AA, AAa and AAb for observations of shop opacity to be performed by a certified visible emission observer no less than once per week for all EAF facilities subject to subparts AA, AAa or AAb, starting at the end of one EAF heat cycle and stopping at the end of the following heat cycle. The EPA never proposed nor intended to include such a requirement in the final rule. Because this requirement had not been included in the 2022 EAF NSPS proposed rule (87 FR 29710), the public did not have an opportunity to comment on this requirement, and the effects of the requirement were not included in the EPA's cost estimates or economic impact analysis for the 2023 final rule (88 FR 58459).

In addition, after the 2023 final rule was promulgated, the EPA discovered that the charging period associated with the finalized opacity testing requirement in NSPS subpart AAb, despite being the shortest operational period for an EAF, AOD or both, could be broken up into multiple discrete time periods at some EAF, AOD, or both and that the opacity plume for charging sometimes lasts after charging has stopped. Therefore, testing opacity ''during charging'' for a continuous 3-minute period, as the final EAF NSPS rule required, would not be possible in the case of multiple discrete charges or if the charging plume continues to be observable after charging of materials ceases.

We also discovered a typographical error in the standards section of subpart AAb for measurement of shop opacity, where charging was mentioned twice instead of once and with two different sets of requirements. The duplicative references to ''charging'' would require testing both for 3 minutes and 6 minutes, and require no testing for tapping. This was inconsistent with other provisions of the rule that accurately described the testing requirements and with the EPA's clearly stated intent in the preamble that the 6-minute opacity testing was intended for tapping and the 3-minute testing was intended for charging. (88 FR 58459).

Additional errors we are addressing in this action include: (1) correcting in 40 CFR 60.273(d)(2), 60.273a(d)(2), and 60.273b(d)(2) the omitted timing of the

requirement to conduct shop opacity monitoring when more than one EAF are located in a shop; and (2) correcting in 40 CFR 60.273(c), 60.273a(c), and 60.273b(e) the erroneous requirement included in the final rule that all fabric filters must have a continuous opacity monitoring system (COMS) or bag leak detection system (BLDS) by renumbering the regulatory text as 40 CFR 60.273(c)(1)–(c)(3)/60.273a(c)(1)–(c)(3) and removing the phrase ''on all fabric filters'' in 40 CFR 60.273b(e); and (3) renumbering rule text in 40 CFR 60.274b(c)(1)–(c)(5) to clarify that the requirements in paragraphs (c)(1)–(c)(3) of §§ 60.274, 60.274a, and 60.274b are a choice, and that (c)(4) and (c)(5) apply to any of the choices made in (c)(1)–(c)(3).

We also discovered that several paragraphs under ''Monitoring of operations'' in subpart AA § 60.274(b), (c), and (i), subpart AAa § 60.274a(b), (c), and (h), and subpart AAb § 60.274b(b), (c), and (h) do not reflect what we plainly stated in the preamble (88 FR 58465, 58466, 58484), in response to comments, that we were not adopting the proposed rule provisions that would have required continuously monitoring of volumetric flow rate at each separately ducted hood and furnace static pressure, and instead were finalizing provisions that require recording these parameters as no greater than 15-minute integrated block averages. Relatedly, the 2023 final regulatory text was ambiguous as to whether facilities needed to monitor 15-minute rolling averages or integrated block averages. Our stated intent in the preamble to the final rule was to require 15-minute integrated block averages; therefore, in this action, in §§ 60.274 and 60.274a, we are clarifying that volumetric flow rates and furnace static pressure are to be recorded as no greater than 15-minute integrated block averages.

Finally, we also discovered a phrase under ''Recordkeeping and reporting'' in subparts AA, AAa, and AAb under 40 CFR 60.276(a)/60.276a(c)/60.276b(c) that was unintentionally and inadvertently deleted in the final regulations in regard to operation of fan motors for owners and operators that elect to install a furnace static pressure monitoring device. Specifically, the regulatory text inadvertently omitted a provision stating that ''operation of control system fan motor amperes at values exceeding ±15 percent of the value established under 40 CFR 60.274(c)/60.274a(c)/60.274b(c)'' also constitutes unacceptable operation and maintenance of the affected facility. Therefore, we are restoring this phrase

in subparts AA, AAa, and AAb under 40 CFR 60.276(a)/60.276a(c)/60.276b(c).

The EPA is issuing this interim final rule to correct these errors included in the EAF NSPS 2023 final rule.

*B. Specific Regulatory Revisions*

The regulatory revisions to 40 CFR part 60, subparts AA, AAa, and AAb that are being revised in this action include the following:

1. Corrections to 40 CFR Part 60, Subparts AA and AAa

In this action, we are removing the inadvertently included requirement in 40 CFR 60.273(d)(2) and 60.273a(d)(2) "Emission monitoring" for lengthy, conflicting, and costly weekly opacity monitoring from the end of one EAF, AOD, or both heat cycles to the end of the following heat cycle, a time period that lasts from 1 to 10 hours, with an estimated average of 5 hours. As written, the promulgated 2023 final rule erroneously required hours-long testing that would have significant cost impacts, which are estimated to be approximately $6 million per year. This requirement was not proposed and was inadvertently added into the final rule, without appropriate analysis and opportunity for public comment. Moreover, this requirement is not necessary to ensure compliance with the standard and would cause a significant unintended financial impact on the EAF, AOD, or both currently subject to NSPS subpart AA and AAa.

We are also clarifying when to conduct the weekly shop opacity monitoring when there is more than one EAF located in a shop by adding "during the heat cycle as defined in 40 CFR 60.271," which was inadvertently omitted from the final rule. As written in the 2023 final rule 40 CFR 60.273(d)(2) and 60.273a(d)(2), the regulations are unclear as to when opacity monitoring should be completed. The clarification being finalized in this interim final current rule will require that once a week, facility shops with more than one EAF are to perform the required daily opacity monitoring when all EAF in the shop are operating. Following these corrections, subparts AA and AAa retain the requirement for daily opacity testing during melting and refining, tapping, and charging for time periods of 6, 6, and 3 minutes, respectively, as well as the requirement that facilities with more than one EAF in a shop test opacity once a week with all EAF in operation.

In this action, we are also correcting errors in 40 CFR 60.273(c) and 60.273a(c) by removing the erroneous requirement included in the final rule

that all fabric filters would need to install COMS or BLDS. As written, the promulgated 2023 final rule required a large capital investment for existing facilities with multi-stack fabric filters to install COMS or BLDS on each fabric filter. This erroneous requirement in the final rule is in direct conflict with both the preamble text (88 FR 58465) and our finalized regulations in 40 CFR 60.273(e) and 60.273a(e), which only require BLDS for single stack fabric filters that do not have COMS. Therefore, by adding in paragraph and subparagraph numbers (1)(i), (1)(ii), (2), and (3) in 40 CFR 60.273(c) and 60.273a(c) to make clear that multi-stack fabric filters are not required to install COMS or BLDS if observations of the opacity of the visible emission from the control device are performed by a certified visible emission observer, we will align § 60.273(c) and § 60.273a(c) with § 60.273(e) and 60.273a(e), respectively, and eliminate the requirement for existing facilities to install COMS or BLDS by February 21, 2024.

We are clarifying 40 CFR 60.274(c)(1)–(5) and 60.274a(c)(1)–(5), which, as written in the final regulations, could be interpreted to allow the owner or operator to choose from one of five ways to monitor EAF operation when demonstrating compliance with the shop opacity standards in 40 CFR 60.272(a)(3) and 60.272a(a)(3) where a hood is used for capture, as described in paragraphs 40 CFR 60.274 and 60.274a in subparagraphs (c)(1), (c)(2), (c)(3), (c)(4), and (c)(5). This was an error. We are correcting the requirements, as intended, to clearly allow three choices of subparagraphs (c)(1), (c)(2), or (c)(3) to demonstrate compliance, but also to require a demonstration of compliance with both subparagraphs (c)(4) and (c)(5). These three choices of monitoring in subparagraphs (c)(1), (c)(2), and (c)(3) are choices between (c)(1), monitoring fan motor amperes at each damper position; (c)(2), monitoring volumetric flow rate through each hood; or (c)(3), monitoring volumetric flow rate at the control device inlet and with damper position. The last two subparagraphs of 40 CFR 60.274 and 60.274a, specifically, (c)(4) and (c)(5), were intended to apply to any of the three monitoring choices in (c)(1), (c)(2), or (c)(3), where (c)(4) sets the time requirement for the monitoring as a rolling averaging period not to exceed 15 minutes, and (c)(5) describes how facilities can petition the Administrator to change any of the operating conditions that they had previously chosen among (c)(1), (c)(2),

or (c)(3). Without this correction, the regulations do not clearly indicate how facilities are to appropriately monitor EAF, AOD, or both when demonstrating compliance with the shop opacity standard in 40 CFR 60.272(a)(3) and 60.272a(a)(3) where a hood is used for capture. Therefore, as written in the 2023 final rule, facilities already subject to the applicable standards could inadvertently become noncompliant.

We also are correcting subparts AA and AAa, "Monitoring of operations" in 40 CFR 60.274(b), (c), and (i) and 60.274a(b), (c), and (h) for the parameters of volumetric flow rate through each separately ducted hood and furnace static pressure by removing the requirements to record a rolling 15-minute average on a continuous basis. As stated in the final rule preamble (88 FR 58465, 58466), we intended to change this proposed provision in response to comments and replace it with the requirement to record as no greater than 15-minute integrated block averages. Without these corrections, the regulations would be inconsistent with our intended final action as described in the 2023 final rule preamble, would not clearly indicate how facilities are to appropriately monitor EAF, AOD, or both, and facilities already subject to the applicable standards could inadvertently become noncompliant.

Finally, we are correcting a requirement that was unintentionally and inadvertently deleted in subparts AA and AAa, "Recordkeeping and reporting" in 40 CFR 60.276(a)/ 60.276a(c)/60.276b(c), regarding the operation of fan motors for owners and operators that elect to install a furnace static pressure monitoring device under 40 CFR 60.274(f)/60.274a(f)/60.274b(f). We are restoring the provision specifying that "operation of control system fan motor amperes at values exceeding ±15 percent of the value established under 40 CFR 60.274(c)/ 60.274a(c)/60.274b(c)" also constitutes unacceptable operation and maintenance of the affected facility in addition to operation at flow rates lower than those established under 40 CFR 60.274(c)/60.274a(c)/60.274b(c). We never proposed to modify this provision and its deletion in the final rule was unintended. As written in the final regulations, facilities already subject to the applicable standards could inadvertently become noncompliant if we do not make this correction.

2. Corrections to Subpart AAb

We are making the same correction to subpart AAb as described in in II.B.1 for subparts AA and AAa because the requirement for lengthy, conflicting, and

costly weekly opacity monitoring from the end of one EAF, AOD, or both heat cycles to the end of the following heat cycle'' in 40 CFR 60.273b(d)(2) ''Emission monitoring'' was not proposed in 2022 (87 FR 29710), was not intended to be included in the promulgated 2023 final rule (88 FR 58459), and is not necessary to ensure compliance with the standards. In addition, this provision was not included in the cost estimates for the final rule or economic impact analysis. The correction for subpart AAb in this action returns the requirement in 40 CFR 60.273b(d)(2) to what had been proposed (87 FR 29710), where opacity testing was required to be performed at least once per day when the furnace is operating. This correction is consistent with the requirements in the standards section of the rule, at 40 CFR 60.272b(a)(3), which were unchanged between the proposed rule (87 FR 29710) and promulgated final rule (88 FR 58459).

We are also clarifying, as we are in subparts AA and AAa, when to conduct the weekly shop opacity monitoring when there is more than one EAF located in a shop, by adding ''during the heat cycle as defined in 40 CFR 60.271b.'' This clarification requires that once a week, facility shops with more than one EAF perform the required daily opacity monitoring when all EAFs are operating.

Additionally in this action, we are correcting procedures for opacity testing of shop emissions under Method 9 in subpart AAb at 40 CFR 60.271b ''Definitions,'' 40 CFR 60.272b(a)(3) ''Standard for particulate matter,'' and 40 CFR 60.273b(d)(3) ''Emission monitoring,'' to address the situation where charging periods at some EAF, AOD, or both may be broken into multiple, shorter periods of charging rather than one continuous charge, and for delayed plumes from charging. The final rule promulgated in 2023 (88 FR 58442) defined the charging testing period in subpart AAb as ''12 15-second *continuous* opacity observations'' (a total of 3 minutes) to accommodate the shorter periods of charging that are less than the 6 minutes required for melting and refining, and for tapping. However, as promulgated in the 2023 final rule, this requirement may not always be technically feasible for a facility to meet. In this interim final rule, we are clarifying that the 3 minutes of opacity observation does not need to be continuous (although the observation periods should still total 3 minutes), to accommodate EAF, AOD, or both that are charged in multiple short batches of less than a duration of 3 minutes each.

In some instances, the opacity due to charging can continue to be observable after the charging activity has stopped, but before melting and refining begins. As provided in the 2023 final rule, the compliance testing requirements cannot be accurately completed at some facilities due to short charging periods and the requirement to only test opacity during charging. In this action, we are thus clarifying that the charging opacity observations can continue after the activity of charging ceases, up until melting and refining begins, which is necessary when opacity observations during charging have not yet reached 3 minutes in total and the charging opacity continues up until melting and refining begins.

Therefore, this action corrects the charging opacity measurement regulatory text to remove ''continuous,'' and define the opacity measurement period as beginning when charging is first initiated and continuing until melting and refining begins, for a minimum of three minutes of total opacity readings. The result of this change is that the opacity test result for charging should be calculated from the average of the highest twelve 15-second opacity observations (total of 3 minutes) during the charging period that is defined as beginning when charging is first initiated and continuing until melting and refining begins, to produce a 3-minute opacity average in an integrated sample, as permitted under section 2.5 of Method 9.

We are correcting in this interim final rule a typographic error in 40 CFR 60.272b(a)(3) ''Standard for particulate matter'' promulgated in the final rule in 2023 (88 FR 58459), where charging was required to be tested both *without modification* of the 6-minute observation time period as well as *with modification* to reduce the observation time period to 3 minutes. The former time period of 6 minutes should have been attributed to tapping and not charging, as is done in two other places in the 2023 final rule (*i.e.*, in 40 CFR 60.271b ''Definitions'' and 40 CFR 60.273b(d)(3) ''Emission monitoring''). Therefore, we are correcting the first mention in 40 CFR 60.272b(a)(3) from ''charging'' to ''tapping.''

Additionally in this action, we are making the same correction to subpart AAb, as described in II.B.1, for subparts AA and AAa, by removing the requirement erroneously included in the final regulations in 40 CFR 60.273b(e) that all fabric filters need to have COMS or BLDS installed. By removing the phrase ''on all fabric filters'' to make clear that multi-stack fabric filters are not required to install COMS or BLDS

if observations of the opacity of the visible emission from the control device are performed by a certified visible emission observer, we will align 40 CFR 60.273b(e) with 40 CFR 60.273b(c) and eliminate the need for all new, modified or reconstructed facilities to install COMS or BLDS upon startup. We are also making the same correction to subpart AAb, as described in II.B.1 for subparts AA and AAa, to allow a choice between 40 CFR 60.274b(c)(1), (c)(2), or (c)(3) to demonstrate compliance, but then also require a demonstration of compliance with both subparagraphs (c)(4) and (c)(5). Without this edit, the regulations do not clearly indicate how facilities are to appropriately monitor EAF, AOD or both when demonstrating compliance with the shop opacity standard in 40 CFR 60.272b(a)(3) where a hood is used for capture. Therefore, as written in our final rule, facilities could inadvertently become noncompliant.

We are making the same correction to subpart AAb under ''Monitoring of operations'' in 40 CFR 60.274b(b), (c), and (h), as described in II.B.1 for subparts AA and AAa, for the parameters of volumetric flow rate through each separately ducted hood and furnace static pressure. We are removing the requirements to record ''rolling 15-minute averages on a continuous basis'' for the values for these parameters and replacing with the requirement to ''record as no greater than 15-minute integrated block averages.''

Finally, we are making the same corrections to subpart AAb under ''Recordkeeping and reporting requirements,'' as described in II.B.1 for subparts AA and AAa, for a requirement that was unintentionally and inadvertently deleted in the final rule for subpart AAb under 40 CFR 60.276b(c), in regard to operation of fan motor for owners and operators that elect to install a furnace static pressure monitoring device under 40 CFR 60.274b(f). We are restoring the provision specifying that ''operation of control system fan motor amperes at values exceeding ±15 percent of the value established under 40 CFR 60.274b(c)'' also constitutes unacceptable operation and maintenance of the affected facility in addition to operation at flow rates lower than those established under 40 CFR 60.274b(c).

## III. Rulemaking Procedures

As noted in section I.C. of this document, the EPA's authority for the rulemaking procedures followed in this

action is provided by APA section 553.[3] In general, an agency issuing a rule under the procedures in APA section 553 must provide prior notice and an opportunity for public comment, but APA section 553(b)(B) includes an exemption from notice-and-comment requirements "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons, therefore, in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." This action is being issued without prior notice or opportunity for public comment because the EPA finds that the APA "good cause" exemption from notice-and-comment requirements applies here.

Following notice-and-comment procedures is impracticable and unnecessary for this action. The costly, conflicting, and burdensome opacity emissions monitoring requirements inadvertently included in subparts AA, AAa, and AAb were not proposed and were never intended to become part of the regulatory text of the 2023 final rule. These opacity monitoring requirements, as described in section II. of this action, would add significant cost impacts to new and currently operating sources that were not considered or included in the 2023 final rule because the EPA neither intended nor anticipated finalizing such a provision. These erroneous requirements are already in effect with respect to facilities subject to subpart AAb and will apply to facilities subject to NSPS subparts AA and AAa on February 21, 2024. Thus, it is critical to timely avoid this unintended and significant burden.

Regarding the correction to subpart AAb for procedures for opacity testing of shop emissions under Method 9, the regulations as finalized are technically impossible for some facilities to meet due to opacity plumes that could be delayed after charging stops, but before melting and refining begins. Accordingly, a new facility that is constructed, modified, or reconstructed would be subject to compliance assurance provisions in subpart AAb with which the facility may not be able to comply. This would create an unreasonable situation where a facility could be considered to be in violation because it cannot comply with these compliance assurance requirements, even though it would be able to technically meet the applicable performance standard. Therefore, it is imperative that the EPA make this correction to ensure new, modified, and reconstructed are subject to opacity testing requirements that are achievable.

Finally, this action is correcting several inadvertent errors in the regulatory text of the final rule. First, this action is removing a duplicative and contradictory reference in 40 CFR 60.272ba(a)(3) to the charging requirement, which does not change the substance of the testing requirements. Second, this action is correcting regulatory text in subparts AA, AAa, and AAb that accidentally retained certain proposed language, contrary to the EPA's expressly stated intent in the final rule preamble. And third, the EPA is restoring provisions that were unintentionally deleted without prior notice or explanation and which should have been retained. This action corrects these oversights which, as described in section II., could cause some facilities to become inadvertently noncompliant with the standards and subject to potential enforcement action if not expeditiously corrected.

This action is effective immediately upon publication. Section 553(d) of the APA requires publication of the final rule to precede the effective date by at least 30 days unless, as relevant here, the rule relieves a restriction (40 CFR 553(d)(1)) or the agency finds good cause to make the rule effective sooner (40 CFR 553(d)(3)). Under APA section 553(d)(1), an exception applies to a rule that "grants or recognizes an exemption or relieves a restriction." Because the corrections in this action relieve restrictions placed on facilities from the 2023 final rule (*e.g.,* removing an unintended, burdensome and costly opacity monitoring requirement and relaxing unachievable testing requirements), the normal 30-day minimum period between this action's dates of publication and effectiveness is not required. Additionally, as explained throughout this action, because the corrections to the final rule relieve impracticable regulatory burdens and make ministerial clarifications, there is a secondary good cause basis for immediate effectiveness under APA section 553(d)(3). See *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996) (in determining whether good cause exists to make a rule immediately effective, an agency should "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling"). Because the rule does not impose any new regulatory requirements, the regulated community does not need time to prepare for the rule to come into effect.

## IV. Request for Comment

As explained in section III. of this document, the EPA finds good cause to take this interim final action without prior notice or opportunity for public comment. However, the EPA is providing an opportunity for comment on the content of the amendments and, thus, requests comment on the corrections described in this rule. The EPA is not reopening for comment any provisions of the 2023 final rule other than the specific provisions that are expressly amended in this interim final rule.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review, as Amended by Executive Order 14094: Modernizing Regulatory Review

This action is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 14094, and was therefore not subject to a requirement for Executive Order 12866 review.

### B. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. The Office of Management and Budget (OMB) has previously approved the information collection activities that apply to the EAF facilities affected by this action and has assigned OMB control number 2060–0038. This action does not change the information collection requirements.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities.

### D. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or

---

[3] Under CAA section 307(d)(1)(C), the EPA's promulgation or revision of any standard of performance under CAA section 111 would normally be subject to the rulemaking procedural requirements of CAA section 307(d), including notice-and-comment procedures, but CAA section 307(d) does not apply "in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of [APA section 553(b)]." CAA section 307(d)(1).

uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector. This rule corrects unintended errors in previous rule.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have Tribal implications as specified in Executive Order 13175. This rule will implement corrections and clarifications to rule text applicable directly to the regulated industry that needed clarification or that were erroneously included in final rule. Thus, Executive Order 13175 does not apply to this action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

Executive Order 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because it is not a significant regulatory action under section 3(f)(1) of Executive Order 12866, and because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children. The EPA does not believe there are disproportionate risks to children because of this action since it will not result in any changes to the control of air pollutants.

### H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51

This action does not involve technical standards; therefore, the NTTAA does not apply.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All

The EPA believes that this type of action does not concern human health or environmental conditions and, therefore, cannot be evaluated with respect to potentially disproportionate and adverse effects on communities with environmental justice concerns.

### K. Congressional Review Act (CRA)

This action is subject to the Congressional Review Act (CRA), 5 U.S.C. 801–808, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. The CRA allows the issuing agency to make a rule effective sooner than otherwise provided by the CRA if the agency makes a good cause finding that notice and comment rulemaking procedures are impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 808(2)). The EPA has made a good cause finding for this rule as discussed in section III. of this document, including the basis for that finding.

### List of Subjects in 40 CFR Part 60

Environmental protection, Administrative practice and procedures, Air pollution control, Incorporation by reference, Reporting and recordkeeping requirements.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, the EPA amends 40 CFR part 60 as follows:

## PART 60—STANDARDS OF PERFORMANCE FOR NEW STATIONARY SOURCES

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart AA—Standards of Performance for Steel Plants: Electric Arc Furnaces Constructed After October 21, 1974, and On or Before August 17, 1983

■ 2. Amend § 60.273 by revising paragraphs (c) and (d)(2) to read as follows:

### § 60.273 Emission monitoring.

\* \* \* \* \*

(c)(1) A continuous monitoring system for the measurement of the opacity of emissions discharged into the atmosphere from the control device(s) is not required:

(i) On any modular, multistack, negative-pressure or positive-pressure fabric filter if observations of the opacity of the visible emission from the control device are performed by a certified visible emission observer; or

(ii) On any single-stack fabric filter if observations of the opacity of the visible emissions from the control device are performed by a certified visible emission observer and the owner installs and operates a bag leak detection system according to paragraph (e) of this section whenever the control device is being used to remove particulate matter from the EAF.

(2) Visible emission observations shall be conducted at least once per day of the control device for at least three 6-minute periods when the furnace is operating in the melting and refining period. All visible emissions observations shall be conducted in accordance with EPA Method 9 of appendix A to this part, or, as an alternative, according to ASTM D7520–16 (incorporated by reference, see § 60.17), with the caveats described under *Shop opacity* in § 60.271.

(3) If visible emissions occur from more than one point, the opacity shall be recorded for any points where visible emissions are observed. Where it is possible to determine that a number of visible emission points relate to only one incident of the visible emission, only one set of three 6-minute observations will be required. In that case, EPA Method 9 observations must be made for the point of highest opacity that directly relates to the cause (or location) of visible emissions observed during a single incident. Records shall be maintained of any 6-minute average that is in excess of the emission limit specified in § 60.272(a)(2).

(d) \* \* \*

(2) No less than once per week, during a heat time as defined in § 60.271, a melt shop with more than one EAF shall conduct these readings while all EAFs are in operation. All EAFs are not required to be on the same schedule for tapping.

\* \* \* \* \*

■ 3. Amend § 60.274 by revising paragraphs (b)(1), (b)(3), (c), and (i)(9) to read as follows:

### § 60.274 Monitoring of operations.

\* \* \* \* \*

(b) \* \* \*

(1) Monitor and record once per shift the block 15-minute average furnace static pressure (if a DEC system is in

use, and a furnace static pressure gauge is installed according to paragraph (f) of this section) and either:

(i) Install, calibrate, and maintain a monitoring device that continuously records the capture system fan motor amperes and damper position(s); or

(ii) Monitor and record as no greater than 15-minute integrated block average basis the volumetric flow rate through each separately ducted hood; or

(iii) Install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the control device inlet and record damper position(s).

\*    \*    \*    \*    \*

(3) Parameters monitored pursuant to this paragraph, excluding damper position, shall be recorded as integrated block averages not to exceed 15 minutes.

(c)(1) When the owner or operator of an affected facility is required to demonstrate compliance with the standards under § 60.272(a)(3) and at any other time that the Administrator may require (under section 114 of the CAA, as amended), the owner or operator shall, during periods in which a hood is operated for the purpose of capturing emissions from the affected facility subject to paragraph (b) of this section, either:

(i) Monitor and record the fan motor amperes at each damper position, and damper position consistent with paragraph (i)(5) of this section; or

(ii) Monitor and record as no greater than 15-minute integrated block average basis the volumetric flow rate through each separately ducted hood; or

(iii) Install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the control device inlet and monitor and record the damper position consistent with paragraph (i)(5) of this section.

(2) Parameters monitored pursuant to this paragraph, excluding damper position, shall be recorded as integrated block averages not to exceed 15 minutes.

(3) The owner or operator may petition the Administrator or delegated authority for reestablishment of these parameters whenever the owner or operator can demonstrate to the Administrator's or delegated authority's satisfaction that the EAF operating conditions upon which the parameters were previously established are no longer applicable. The values of the parameters as determined during the most recent demonstration of compliance shall be the appropriate operational range or control set point throughout each applicable period.

Operation at values beyond the accepted operational range or control set point may be subject to the requirements of § 60.276(a).

\*    \*    \*    \*    \*

(i) \*    \*    \*

(9) Parameters monitored pursuant to paragraphs (i)(6) through (8) of this section shall be recorded as integrated block averages not to exceed 15 minutes.

■ 4. Amend § 60.276 by revising paragraph (a) to read as follows:

**§ 60.276   Recordkeeping and reporting requirements.**

(a) Continuous operation at a furnace static pressure that exceeds the operational range or control setting under § 60.274(g), for owners and operators that elect to install a furnace static pressure monitoring device under § 60.274(f) and either operation of control system motor amperes at values exceeding ±15 percent of the value established under § 60.274(c) or operation at flow rates lower than those established under § 60.274(c) may be considered by the Administrator or delegated authority to be unacceptable operation and maintenance of the affected facility. Operation at such values shall be reported to the Administrator or delegated authority semiannually.

\*    \*    \*    \*    \*

■ 5. Amend the subpart AAa heading by revising it to read as follows:

**Subpart AAa—Standards of Performance for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarbonization Vessels Constructed After August 17, 1983, and On or Before May 16, 2022**

\*    \*    \*    \*    \*

■ 6. Amend § 60.273a by revising paragraphs (c) and (d)(2) to read as follows:

**§ 60.273a   Emission monitoring.**

\*    \*    \*    \*    \*

(c)(1) A continuous monitoring system for the measurement of the opacity of emissions discharged into the atmosphere from the control device(s) is not required:

(i) On any modular, multistack, negative-pressure or positive-pressure fabric filter if observations of the opacity of the visible emission from the control device are performed by a certified visible emission observer; or

(ii) On any single-stack fabric filter if observations of the opacity of the visible emissions from the control device are performed by a certified visible emission observer and the owner

installs and operates a bag leak detection system according to paragraph (e) of this section whenever the control device is being used to remove particulate matter from the EAF or AOD.

(2) Visible emission observations shall be conducted at least once per day of the control device for at least three 6-minute periods when the furnace is operating in the melting and refining period. All visible emissions observations shall be conducted in accordance with EPA Method 9 of appendix A to this part, or, as an alternative, according to ASTM D7520–16 (incorporated by reference, see § 60.17), with the caveats described under *Shop opacity* in § 60.271.

(3) If visible emissions occur from more than one point, the opacity shall be recorded for any points where visible emissions are observed. Where it is possible to determine that a number of visible emission points relate to only one incident of the visible emission, only one set of three 6-minute observations will be required. In that case, EPA Method 9 observations must be made for the point of highest opacity that directly relates to the cause (or location) of visible emissions observed during a single incident. Records shall be maintained of any 6-minute average that is in excess of the emission limit specified in § 60.272(a)(2).

(d) \*    \*    \*

(2) No less than once per week, during the heat cycle as defined in § 60.271a, melt shop with more than one EAF shall conduct these readings while all EAFs are in operation. All EAFs are not required to be on the same schedule for tapping.

\*    \*    \*    \*    \*

■ 7. Amend § 60.274a by revising paragraphs (b)(1), (b)(3), (c), and (h)(9) to read as follows:

**§ 60.274a   Monitoring of operations.**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(1) Monitor and record once per shift the block 15-minute average furnace static pressure (if a DEC system is in use, and a furnace static pressure gauge is installed according to paragraph (f) of this section) and either:

(i) Install, calibrate, and maintain a monitoring device that continuously records the capture system fan motor amperes and damper position(s);

(ii) Monitor and record as no greater than 15-minute integrated block average basis the volumetric flow rate through each separately ducted hood; or

(iii) Install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the

control device inlet and record damper positions(s).

* * * * *

(3) Parameters monitored pursuant to this paragraph, excluding damper position, shall be recorded as integrated block averages not to exceed 15 minutes.

(c)(1) When the owner or operator of an affected facility is required to demonstrate compliance with the standards under § 60.272a(a)(3) and at any other time that the Administrator may require (under section 114 of the CAA, as amended), the owner or operator shall, during periods in which a hood is operated for the purpose of capturing emissions from the affected facility subject to paragraph (b) of this section, either:

(i) Install, calibrate, and maintain a monitoring device that continuously records the fan motor amperes at each damper position, and damper position consistent with paragraph (h)(5) of this section; or

(ii) Monitor and record as no greater than 15-minute integrated block average basis the volumetric flow rate through each separately ducted hood; or

(iii) Install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the control device inlet and monitor and record the damper position consistent with paragraph (h)(5) of this section.

(2) Parameters monitored pursuant to this paragraph, excluding damper position, shall be recorded as integrated block averages not to exceed 15 minutes.

(3) The owner or operator may petition the Administrator or delegated authority for reestablishment of these parameters whenever the owner or operator can demonstrate to the Administrator's or delegated authority's satisfaction that the affected facility operating conditions upon which the parameters were previously established are no longer applicable. The values of the parameters as determined during the most recent demonstration of compliance shall be the appropriate operational range or control set point throughout each applicable period. Operation at values beyond the accepted operational range or control set point may be subject to the requirements of § 60.276a(c).

* * * * *

(h) * * *

(9) Parameters monitored pursuant to paragraphs (h)(6) through (8) of this section shall be recorded as integrated block averages not to exceed 15 minutes.

■ 8. Amend § 60.276a by revising paragraph (c) to read as follows:

§ 60.276a  Recordkeeping and reporting requirements.

* * * * *

(c) Continuous operation at a furnace static pressure that exceeds the operational range or control setting under § 60.274a(g), for owners and operators that elect to install a furnace static pressure monitoring device under § 60.274a(f) and either operation of control system fan motor amperes at values exceeding ±15 percent of the value established under § 60.274a(c) or operation at flow rates lower than those established under § 60.274a(c) may be considered by the Administrator or delegated authority to be unacceptable operation and maintenance of the affected facility. Operation at such values shall be reported to the Administrator or delegated authority semiannually.

* * * * *

## Subpart AAb—Standards of Performance for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarbonization Vessels Constructed After May 16, 2022

■ 9. Amend § 60.271b by revising the definition "Shop opacity" to read as follows:

§ 60.271b  Definitions.

* * * * *

*Shop opacity* means the arithmetic average of 24 observations of the opacity of any EAF or AOD emissions emanating from, and not within, the shop, during melting and refining, and during tapping, taken in accordance with Method 9 of appendix A of this part; and during charging, according to the procedures in section 2.5 of Method 9 in appendix A to part 60 of this chapter, with the following modifications: begin reading opacity when charging is first initiated and continue reading until melting and refining begins, or for a minimum of 3 minutes total. From the readings collected, take the average of the highest 12 15-second opacity observations (total of 3 minutes) during this period to determine the 3-minute opacity average associated with charging. For the daily opacity observation during melting and refining, facilities may measure opacity by EPA Method 22 of appendix A of this part, modified to require the recording of the aggregate duration of visible emissions at 15-second intervals. Alternatively, ASTM D7520–16 (incorporated by reference, see § 60.17), may be used with the following five conditions:

(1) During the digital camera opacity technique (DCOT) certification procedure outlined in section 9.2 of ASTM D7520–16 (incorporated by reference, see § 60.17), the owner or operator or the DCOT vendor must present the plumes in front of various backgrounds of color and contrast representing conditions anticipated during field use such as blue sky, trees, and mixed backgrounds (clouds and/or a sparse tree stand);

(2) The owner or operator must also have standard operating procedures in place including daily or other frequency quality checks to ensure the equipment is within manufacturing specifications as outlined in section 8.1 of ASTM D7520–16 (incorporated by reference, see § 60.17);

(3) The owner or operator must follow the recordkeeping procedures outlined in § 60.7(f) for the DCOT certification, compliance report, data sheets, and all raw unaltered JPEGs used for opacity and certification determination;

(4) The owner or operator or the DCOT vendor must have a minimum of four independent technology users apply the software to determine the visible opacity of the 300 certification plumes. For each set of 25 plumes, the user may not exceed 15 percent opacity of any one reading and the average error must not exceed 7.5 percent opacity;

(5) Use of this approved alternative does not provide or imply a certification or validation of any vendor's hardware or software. The onus to maintain and verify the certification and/or training of the DCOT camera, software, and operator in accordance with ASTM D7520–16 (incorporated by reference, see § 60.17) and these requirements is on the facility, DCOT operator, and DCOT vendor.

* * * * *

■ 10. Amend § 60.272b by revising paragraph (a)(3) to read as follows:

§ 60.272b  Standard for particulate matter.

(a) * * *

(3) Exit from a shop and, due solely to the operations of any affected EAF(s) or AOD vessel(s) during melting and refining exhibit greater than 0 percent opacity, and during tapping exhibit greater than 6 percent opacity, as measured in accordance with Method 9 of appendix A of this part; and during charging, exhibit greater than 6 percent opacity, as measured according to the procedures in section 2.5 of Method 9 in appendix A to part 60 of this chapter, with the modification of this section of Method 9, as follows: begin reading opacity when charging is first initiated and continue reading until melting and refining begins, or for a minimum of 3 minutes total. From the readings

collected, take the average of the highest 12 15-second opacity observations (total of 3 minutes) during this period to determine the 3-minute opacity average associated with charging. For the daily opacity observation during melting and refining, facilities may measure opacity by EPA Method 22 of appendix A of this part, modified to require the recording of the aggregate duration of visible emissions at 15-second intervals. As an alternative, facilities may measure opacity according to ASTM D7520–16 (incorporated by reference, see § 60.17), with the caveats described under *Shop opacity* in § 60.271 or, for the daily opacity observations during melting and refining, exhibit 0 seconds of visible emissions as measured by EPA Method 22 of appendix A of this part, modified to require the recording of the aggregate duration of visible emissions at 15-second intervals. Shop opacity shall be recorded for any point(s) during melting and refining, during charging, and during tapping where visible emissions are observed. Where it is possible to determine that a number of visible emission sites relate to only one incident of visible emissions during melting and refining, during charging, or during tapping, only one observation of shop opacity or visible emissions will be required during melting and refining, during charging, or during tapping. In this case, the shop opacity or visible emissions observations must be made for the point of highest opacity during melting and refining, during charging, or during tapping that directly relates to the cause (or location) of visible emissions observed during a single incident.

\* \* \* \* \*

■ 11. Amend § 60.273b by revising paragraphs (c), (d)(2), (d)(3), and (e) introductory text to read as follows:

### § 60.273b    Emission monitoring.

\* \* \* \* \*

(c)(1) A continuous monitoring system for the measurement of the opacity of emissions discharged into the atmosphere from the control device(s) is not required:

(i) On any modular, multistack, negative-pressure or positive-pressure fabric filter if observations of the opacity of the visible emission from the control device are performed by a certified visible emission observer; or

(ii) On any single-stack fabric filter if observations of the opacity of the visible emissions from the control device are performed by a certified visible emission observer and the owner installs and operates a bag leak detection system according to paragraph

(e) of this section whenever the control device is being used to remove particulate matter from the EAF or AOD.

(2) Visible emission observations shall be conducted at least once per day of the control device for at least three 6-minute periods when the furnace is operating in the melting and refining period. All visible emissions observations shall be conducted in accordance with EPA Method 9 of appendix A to this part, or, as an alternative, according to ASTM D7520–16 (incorporated by reference, see § 60.17), with the caveats described under *Shop opacity* in § 60.271.

(3) If visible emissions occur from more than one point, the opacity shall be recorded for any points where visible emissions are observed. Where it is possible to determine that a number of visible emission points relate to only one incident of the visible emission, only one set of three 6-minute observations will be required. In that case, EPA Method 9 observations must be made for the point of highest opacity that directly relates to the cause (or location) of visible emissions observed during a single incident. Records shall be maintained of any 6-minute average that is in excess of the emission limit specified in § 60.272b(a)(2).

(d) \* \* \*

(2) No less than once per week, during the heat cycle as defined in § 60.271b, a melt shop with more than one EAF shall conduct these readings while all EAFs are in operation. All EAFs are not required to be on the same schedule for tapping.

(3) Shop opacity shall be determined as the arithmetic average of 24 consecutive 15-second opacity observations of emissions from the shop taken in accordance with Method 9 during melting and refining and during tapping; and during charging determined according to the procedures in section 2.5 of Method 9 in appendix A to part 60 of this chapter, with the modification as follows: begin reading opacity when charging is first initiated and continue reading until melting and refining begins, or for a minimum of 3 minutes total. From the readings collected, take the average of the highest 12 15-second opacity observations (total of 3 minutes) during this period to determine the 3-minute opacity average associated with charging. For the daily opacity observation during melting and refining, facilities may measure opacity by EPA Method 22 of appendix A of this part, modified to require the recording of the aggregate duration of visible emissions at 15-second intervals. As an alternative, facilities may measure the opacity according to ASTM D7520–16

(incorporated by reference, see § 60.17), with the caveats described under *Shop opacity* in § 60.271, or, during melting and refining, as the total duration of visible emissions measured according to EPA Method 22 over a 6-minute period, modified to require the recording of the aggregate duration of visible emissions at 15-second intervals. Shop opacity shall be recorded for any point(s) where visible emissions are observed. Where it is possible to determine that a number of visible emission points relate to only one incident of visible emissions, only one observation of shop opacity will be required. In this case, the shop opacity observations must be made for the point of highest opacity that directly relates to the cause (or location) of visible emissions observed during a single incident. Shop opacity shall be determined daily during melting and refining, during charging, and during tapping.

(e) A bag leak detection system must be installed and operated on all single-stack fabric filters whenever the control device is being used to remove particulate matter from the EAF or AOD vessel if the owner or operator elects not to install and operate a continuous opacity monitoring system as provided for under paragraph (c) of this section. In addition, the owner or operator shall meet the visible emissions observation requirements in paragraph (c) of this section. The bag leak detection system must meet the specifications and requirements of paragraphs (e)(1) through (8) of this section.

\* \* \* \* \*

■ 12. Amend § 60.274b by revising paragraphs (b), (c), and (h)(9) to read as follows:

### § 60.274b    Monitoring of operations.

\* \* \* \* \*

(b) Except as provided under paragraph (e) of this section, the owner or operator subject to the provisions of this subpart shall conduct the following monitoring of the capture system to demonstrate continuous compliance:

(1) If a DEC system is in use, according to paragraph (f) of this section, monitor and record once per shift the block 15-minute average furnace static pressure and any one of (2) through (4) in this paragraph:

(2) Install, calibrate, and maintain a monitoring device that continuously records the fan motor amperes at each damper position, and damper position consistent with paragraph (h)(5) of this section; or

(3) Monitor and record as no greater than 15-minute integrated block average basis the volumetric air flow rate at each separately ducted hood; or

(4) Install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the control device inlet and monitor and record the damper position consistent with paragraph (h)(5) of this section.

(5) The furnace static pressure monitoring device(s) shall be installed in an EAF or DEC duct prior to combining with other ducts and prior to the introduction of ambient air, at a location that has no flow disturbance due to the junctions.

(6) The volumetric flow monitoring device(s) may be installed in any appropriate location in the capture system such that reproducible flow rate monitoring will result. The flow rate monitoring device(s) shall have an accuracy of ±10 percent over its normal operating range and shall be calibrated according to the manufacturer's instructions. The Administrator may require the owner or operator to demonstrate the accuracy of the monitoring device(s) relative to EPA Methods 1 and 2 of appendix A of this part.

(7) Parameters monitored pursuant to this paragraph, excluding damper position, shall be recorded as integrated block averages not to exceed 15 minutes.

(c)(1) When the owner or operator of an affected facility is required to demonstrate compliance with the standards under § 60.272b(a)(3) and at any other time that the Administrator may require (under section 114 of the CAA, as amended), the owner or operator shall, during all periods in which a hood is operated for the purpose of capturing emissions from the affected facility subject to paragraph (b) of this section, either:

(i) Install, calibrate, and maintain a monitoring device that continuously records the fan motor amperes at each damper position, and damper position consistent with paragraph (h)(5) of this section;

(ii) Monitor and record as no greater than 15-minute integrated block average basis the volumetric flow rate through each separately ducted hood; or

(iii) Install, calibrate, and maintain a monitoring device that continuously records the volumetric flow rate at the control device inlet, and monitor and record the damper position consistent with paragraph (h)(5) of this section.

(2) Parameters monitored pursuant to this paragraph, excluding damper position, shall be recorded as integrated block averages not to exceed 15 minutes.

(3) The owner or operator may petition the Administrator or delegated authority for reestablishment of these parameters whenever the owner or operator can demonstrate to the Administrator's or delegated authority's satisfaction that the affected facility operating conditions upon which the parameters were previously established are no longer applicable. The values of the parameters as determined during the most recent demonstration of compliance shall be the appropriate operational range or control set point throughout each applicable period. Operation at values beyond the accepted operational range or control set point may be subject to the requirements of § 60.276b(c).

*    *    *    *    *

(h) * * *

(9) Parameters monitored pursuant to paragraphs (h)(6) through (8) of this section shall be recorded as integrated block averages not to exceed 15 minutes.

■ 13. Amend § 60.276b by revising paragraph (c) to read as follows:

### § 60.276b   Recordkeeping and reporting requirements.

*    *    *    *    *

(c) Operation at a furnace static pressure that exceeds the operational range or control setting under § 60.274b(g), for owners and operators that elect to install a furnace static pressure monitoring device under § 60.274b(f) and either operation of control system fan motor amperes at values exceeding ±15 percent of the value established under § 60.274b(c) or operation ranges or control settings outside of those established under § 60.274b(c) may be considered by the Administrator or delegated authority to be unacceptable operation and maintenance of the affected facility. Operation at such values shall be reported to the Administrator or delegated authority semiannually.

*    *    *    *    *

[FR Doc. 2024–02634 Filed 2–13–24; 8:45 am]

**BILLING CODE 6560–50–P**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 223

**[Docket No. 240208–0042; RTID 0648–XR071]**

### Endangered and Threatened Wildlife and Plants: Listing the Queen Conch as Threatened Under the Endangered Species Act (ESA)

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** We, NMFS, are listing the queen conch (*Aliger gigas,* formerly known as *Strombus gigas*) as a threatened species under the Endangered Species Act (ESA). We have completed a review of the status of queen conch, including efforts being made to protect the species, and considered public comments submitted on the proposed listing rule as well as new information received since the publication of the proposed rule. Based on all of this information, we have determined that the queen conch is not currently in danger of extinction throughout all or a significant portion of its range, but is likely to become so within the foreseeable future. Thus, we are listing the queen conch as a threatened species under the ESA. At this time, we conclude that critical habitat is not yet determinable because data sufficient to perform the required analysis are lacking; any critical habitat designation would be proposed in a separate, future rulemaking.

**DATES:** This final rule is effective on March 15, 2024.

**ADDRESSES:** Public comments that were submitted on the proposed rule to list queen conch are available at *https://www.regulations.gov* identified by docket number NOAA–NMFS–2019–0141. A list of references cited in this final rule and other supporting materials are available at: *https://www.fisheries.noaa.gov/species/queen-conch,* or by submitting a request to the National Marine Fisheries Service, Southeast Regional Office, Protected Resources Division, 263 13th Avenue South, St. Petersburg, Florida 33701. Information relevant to inform separate rulemakings to designate critical habitat for queen conch or issue protective regulations for queen conch may be submitted to this mailing address or to the email address indicated below (see **FOR FURTHER INFORMATION CONTACT**).

**FOR FURTHER INFORMATION CONTACT:** Orian Tzadik, NMFS Southeast Regional Office, (813) 906–0353–C; or *Orian.Tzadik@noaa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

On February 27, 2012, we received a petition from WildEarth Guardians to list the queen conch as threatened or endangered throughout all or a significant portion of its range under the ESA. We determined that the petitioned action may be warranted and published a positive 90-day finding in the **Federal**